**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JONATHAN HAYES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-01050** |
| | ) | **Judge Aleta A. Trauger** |
| **FORENSIC MEDICAL** | ) | |
| **MANAGEMENT SERVICES, PLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Before the court is the Motion for Summary Judgment filed by defendant Forensic Medical

Management Services, PLC ("FMMS"), seeking judgment in its favor on plaintiff Jonathan

Hayes's claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans

with Disabilities Act ("ADA"). (Doc. No. 38.) For the reasons set forth herein, the motion will be

granted in part and denied in part.

**I.      FACTS[1]**

Plaintiff Jonathan Hayes is a White male resident of Davidson County, Tennessee and was

formerly employed by FMMS, an employer engaged in interstate commerce and subject to both

---

[1] The facts set forth herein for which no record citation is provided are drawn from the pleadings or the plaintiff's Response to the Defendant's Statement of Undisputed Facts (Doc. No. 46) and are undisputed for purposes of the defendant's motion. The court notes, however, that the defendant's Statement of Undisputed Facts is disjointed, does not create a coherent narrative of events, and contains very few actual undisputed facts. For his part, however, the plaintiff did not file a statement of additional facts that he contends are disputed, as permitted by Local Rule 56.01(c)(3). The background facts set forth herein largely incorporate only those included by the parties in the Statement of Undisputed Facts and Response thereto, though the court has on occasion attempted to provide some context.

Title VII and the ADA. FMMS is a forensic pathology company that provides medical examiner and medical autopsy services, death investigations, expert forensic testimony, and forensic management services to government agencies and private individuals. (Doc. No. 41-4, Leftwich Decl. ¶ 3.)

Hayes was employed by FMMS from August 2011 through September 2012, when he left voluntarily to take a position in law enforcement. He was rehired by FMMS in November 2015. FMMS's Director of Human Resources, Bill Leftwich, who is White, and Chief Forensic Technician Larry Barker, who is Black, were jointly responsible for hiring the plaintiff in 2011, and both approved the plaintiff's return to work at FMMS in 2015. Barker was Hayes's direct supervisor throughout the plaintiff's employment with FMMS.

Hayes was initially hired as a part-time forensic technician.[2] Within a year, he also was assigned the task of "maintaining the evidence locker" and began working full time. (Hayes Dep. 84, 304.)[3] At some point he was promoted to the position of "master forensic technician." (Hayes

---

The "Factual Background" section of the defendant's Memorandum in support of the Motion for Summary Judgment, of course, provides a more coherent narrative, but it also recites numerous facts that were not included in the Statement of Undisputed Facts, as a result of which the plaintiff has not had the opportunity to respond to them or to indicate whether he considers them to be in dispute.

[2] Hayes described the forensic technician's job as basically assisting pathologists in conducting autopsies:

They process incoming bodies that Forensic Medical receives. They take photos, or they can take photos. The[y] process, you know, as in remove clothing, take fingerprints. They assist the doctors and the autopsy itself. They cut out all the organs for the doctors.

They basically, they're the doctor's right hand. Anything the doctor requests; they do drug tests, samples of blood, they collect from bodies. Once the doctor examines the body, they close the body, put everything back, make sure the body is clean. They just basically are the doctor's right hand.

(Doc. No. 41-1, Hayes Dep. 80–81.)

[3] The defendant filed complete copies, in condensed form, of the transcripts of the depositions of Hayes (Doc. No. 41-1), Barker (Doc. No. 41-2), and Leftwich (Doc. No. 41-3).

Dep. 88.) On August 7, 2019, Hayes was suspended without pay, and, on August 16, 2019, he was terminated for cause. His termination and the reasons for it are the subject of this lawsuit.

The defendant points to a July 24, 2019 email from Barker to Leftwich and FMMS's CEO, Dr. Feng Li,[4] about Hayes. In this email, Barker referenced a prior conversation during which Li had requested a list of "incidents regarding [Hayes's] actions, behavior, and demeanor." (Doc. No. 41-1, at 149.) In response, Barker provided a list of thirty-two incidents of purported misconduct by Hayes, organized chronologically and spanning from March 23, 2018 to July 24, 2019. (*Id.*) Examples of the cited incidents include such things as: "became angry with me after I informed him that Kirby [McKinney] would assist him in evidence because he felt overwhelmed"; "asked him to show Kirby how we handle evidence here; he said ok—but didn't"; "creates morale problems with the other techs"; "another tech came to me with concerns about his behavior"; "Kirby asked him about some rape kits to be packaged, told her he'd show her tomorrow"; "continues to shut Kirby out of anything related to evidence except blood spots";[5] "clocks in @ 3AM!! HE DIDN'T ASK ME TO DO THIS!! – said he wanted to clean up the evidence room – does as he pleases"; "Jonathan still ignores me"; "was told to put barcodes on some evidence, he barks back, 'do you want me to do evidence or cut?'"; and "[still] hasn't placed barcodes on evidence yet . . . ." (*Id.*)

In addition, Barker explained:

I feel the supervisor/employee relationship with [Hayes] has deteriorated to the point of no return. After the initial write up on 3/23/2018, [Hayes] has gone to Sr.

---

Hayes superfluously filed his own set of excerpts from these depositions. The court cites herein to the original pagination of each of the referenced transcripts.

[4] The defendant does not identify Dr. Li in its Statement of Undisputed Facts, but he is identified in both parties' evidentiary material. (*See, e.g.*, Doc. No. 41-4, Leftwich Decl. ¶ 14.)

[5] Hayes explained that taking "blood spots" means to take a small sample of blood from a body in order to conduct a DNA analysis. (Hayes Dep. 134.)

Mgmt. complaining on me about a hostile work environment, harassment, etc. And as a direct result of that, I feel powerless to do anything to him, and he feeds off that. The morale between the techs and him is an absolute zero, they don't like or trust him, and it creates undue negative stress in the workplace. Jonathan said he was overwhelmed with evidence, yet he fought having a certified evidence tech help him. He still to this day continues to cut out Kirby with anything related to evidence, except blood spots. The evidence room is "booby trapped" and unorganized, and on his off days, he has occasionally been called to ask where something is located.

(*Id.*)

The plaintiff does not dispute that this email was sent, but, citing his own deposition testimony, he disputes the "truth and/or accuracy" of much of the information within the email. (Doc. No. 46, Resp. to ¶ 8.) Hayes states that, although he was not asked about every point on the list, he explained or denied those he was asked about. For instance, in his deposition, he denied being "angry" when Barker told him McKinney was going to be assisting him in evidence, though he concedes having "some concerns" about her skill level. (Hayes Dep. 126.) Regarding his purported failure to show McKinney how to process rape kits, Hayes denied that McKinney ever came to him to ask for anything. He denied that he ever intentionally ignored Barker. (Hayes Dep. 174.) He denied ever clocking in at 3 a.m. without Barker's permission. (Hayes Dep. 175 ("I would have gotten permission to come in at 3:00 [in] the morning. I wouldn't have just showed up at the morgue for no reason.").) He refuted Barker's statement that he failed to inform Barker before inviting a doctor to view an autopsy. (Hayes Dep. 177.) Regarding his purported failure to put barcodes on evidence, Hayes testified that he remembered numerous times when Barker would come by and want him to drop everything to accommodate some request, and he always acquiesced. But on other occasions, conducting autopsies might take precedence over putting barcodes on evidence, depending on what Barker wanted him to do first. (Hayes Dep. 180–81.)

On August 9, 2019, Barker sent another email to Leftwich that was intended to summarize a conversation that had taken place the previous day. (Doc. No. 41-1, at 154.) Barker relayed two

instances in which Barker and others at FMMS had difficulty locating evidence in FMMS's evidence room and wrote: "[t]he evidence room is in disarray, to find anything in there is a 'scavenger hunt.' It's set up to where only he can find things easily, which makes FMMS look bad when he isn't here." (*Id.* at 155.) Hayes does not dispute that this email was sent, but he denies any knowledge of the incidents related in the email (*see* Hayes Dep. 186) and points to Barker's deposition testimony in which he stated only that the evidence room was "a little messy" when Hayes was in charge of it and that Hayes had a "weird organizing system." (Barker Dep. 91.) Barker also acknowledged Hayes was supposed to be the only technician in the evidence room and that he (Barker) could have called Hayes to ask him where the evidence in question was located. (*Id.* at 92, 116.) Hayes also testified, however, that this incident substantiated his complaints that "evidence [was] overwhelmed" and "backed up." (Hayes Dep. 186.) He did not agree that the evidence room was in "disarray," but he agreed that he was "overwhelmed." (*Id.*)

In the same August 9, 2019 email, Barker wrote:

> The barcodes that I asked [Hayes] to put on the clothing the week before I went on vacation, still isn't there. He still hasn't incorporated Kirby [McKinney] into anything with evidence other than blood spots, he was told a year ago to do so. He completely disregards anything I say, To have him to continue to work in my department is the equivalent of Kennedy having Oswald on his Secret Service detail.

(Doc. No. 41-1, at 155.) Hayes disagreed with these statements, specifically denying that he disregarded things Larry Barker said to him. (Hayes Dep. 187.)

After Leftwich received this email from Barker, Hayes was placed on suspension and then terminated, effective August 16, 2019. (Hayes Dep. 188–89; *see also* Doc. No. 41-1, at 156.)

Hayes alleges that he has diabetes and is either disabled by this condition or was regarded by FMMS as disabled. (Doc. No. 12 ¶¶ 40, 75.) He also alleges that he requested and was denied

a reasonable accommodation for his disability and that the defendant failed to engage in the interactive process required by the ADA. (*Id.* ¶¶ 81–83.)

The defendant characterizes the plaintiff's description of his requested accommodation as "need[ing] [Barker] to fill in so that [Hayes] could take a break." (*See* Hayes Dep. 262.) Hayes, in fact, agreed that he requested an accommodation in the form of "breaks" as needed for his diabetes. (Hayes Dep. 263.) In response to the defendant's Statement of Undisputed Facts, he maintains that he "testified numerous times" that his requested accommodation was that he be permitted to take breaks, not specifically that Barker fill in for him each time he needed a break. (Doc. No. 46, Resp. ¶ 13; *see e.g.* Hayes Dep. 144 ("knowing that I had requested to take breaks, and that I was under medication, and that I didn't feel good[,] [i]t was kind of like he was singling me out to do extra stuff, even after I had informed him, you know, that I wasn't feeling well, or I was sick"); *id.* at 215 ("Well, there were several incidents where I would request breaks or make them aware that I had high sugars, or that I was on medication. And Larry would have me working instead of allowing me to take breaks or not have as big of a work load. And I just felt that I was kind of being singled out because I had that condition."); *id.* at 225 ("he didn't give me the breaks I needed or requested").)

In his Amended Complaint, Hayes alleges that he was the only White forensic technician. According to Leftwich, FMMS employed five other White forensic technicians during the plaintiff's tenure. (Leftwich Decl. ¶¶ 12–13.) The plaintiff disputes that statement in part, alleging that one of the individuals identified by Leftwich was an investigator rather than a forensic technician and denying that he worked with or even knew one of the individuals Leftwich identified. (Hayes Decl. ¶ 3.) Hayes identifies five Black forensic technicians who worked at FMMS during his tenure, in addition to Barker, his supervisor. (*Id.*) In other words, viewing the

facts in the light most favorable to the plaintiff, FMMS employed four White forensic technicians—including Hayes—and five Black forensic technicians during Hayes's tenure, and their direct supervisor was also Black.

The plaintiff testified that his co-workers labeled him as racist. He explained:

> I felt that they were labeling me as a racist because I was reporting their sloppy work or their errors and judgments in evidence or mistakes. And they use that as, you know, kind of getting back at me for reporting them or them getting in trouble.

(Hayes Dep. 212.) At the same time, he believed that their "behavior" demonstrated that they actually thought he was racist, as they did not want to work with him, distanced themselves from him, and generally made comments about him as racist. (*Id.*) In particular, Justin Hammond (who is White) posted and distributed a photoshopped image of Hayes in which he appeared to be wearing the garb of a Ku Klux Klan member. (Hayes Dep. 200.) Charri Hill made comments about whether Hayes "lynched black people on the weekends," and Kirby McKinney made comments about Hayes's not liking "hanging around black people." (Hayes Dep. 200–02.)

Leftwich testified that Hayes was terminated due to a "multitude of poor performance issues." (Leftwich Dep. 49.) The plaintiff does not deny that Leftwich testified thus, but he denies that his performance warranted termination, citing Barker's testimony to the effect that Hayes "was a good tech" but had a problem with "social skills." (Barker Dep. 121.) Barker explained that Hayes was "[h]ard to get along with" and that it "seemed like everybody had an issue with him." (*Id.*) In addition, however, Barker confirmed that Hayes was never put on a performance improvement plan or written up for any of the items on Barker's list of "incidents," other than a single event that took place in March 2018. (*Id.* at 122; *see also* Doc. No. 41-1, at 149, 150.)

The defendant states that plaintiff "testified that he believes that the performance issues . . . listed by Barker in [his] August 9, 2019 email motivated Leftwich and Li to terminate" him. (Doc. No. 40 ¶ 17 (citing Hayes Dep. 198–99).) In the cited testimony, the plaintiff confirmed that he

believed he was "terminated in part because he had been labeled a racist by [his] coworkers" and in part because the list of incidents provided by Barker "motivated Bill Leftwich and Dr. Li to terminate [him]." (Hayes Dep. 198–99.) But Hayes explained elsewhere that he believed Barker's list was essentially an attempt to create a paper trial to justify the termination. (*See* Hayes Dep. 194–95 (describing Barker's list as "his justification in trying to cause disciplinary action" or "trying to justify terminating [him]," even though Hayes was never actually provided a "cause" for his termination).)

In his Amended Complaint, the plaintiff alleges that he reported to his supervisors his issues with being "harassed" by his co-workers and requested the involvement of Human Resources and the CEO, to no avail. (Doc. No. 12 ¶¶ 47, 49.) He further alleges that, on August 6, 2019, "feeling he had no other option," he informed "Defendant" that he was going to file a complaint with the EEOC. (Doc. No. 12 ¶ 52; *see also*.) Leftwich denies having any knowledge of the plaintiff's statement that he intended to file an EEOC charge. (Leftwich Dep. 124.) The plaintiff does not dispute that Leftwich testified thus. He does deny the defendant's assertion that Leftwich, rather than Barker, was primarily responsible for hiring Plaintiff in 2011 and for terminating" him in 2019. (*See* Leftwich Decl. ¶¶ 10–11, 16 (stating that, while Barker and he were both "responsible" for hiring Hayes in 2011 and rehiring him in 2015, Leftwich was the "central figure" in Hayes's hiring and firing).) In his deposition, Leftwich explained that Barker came to him to tell him that Hayes's "behavior had gotten so poor that it was time to recommend termination." (Leftwich Dep. 106.) Leftwich allegedly told Barker that he "need[ed] specifics in order to move forward with . . . such a drastic action," in response to which Barker provided his list of incidents. (Leftwich Dep. 106.) Leftwich did not investigate Barker's allegations, though he was already personally aware of some of the incidents. (Leftwich Dep. 107.) To Leftwich's

knowledge, Hayes had not received a verbal or written reprimand related to any of them except the March 2018 written reprimand, and he had no knowledge of whether Barker had tried to put Hayes on an improvement plan of any kind. (Leftwich Dep. 107–08.)

It is undisputed that, in response to Hayes's complaining to Barker that he was "overwhelmed" by his evidence duties and needed more time on evidence and less on autopsies, Barker told him that Kirby McKinney was going to be assisting him with evidence—more accurately, that McKinney would "take over blood spots," which the plaintiff described as having "nothing to do with the evidence room," so that Hayes could concentrate on evidence. (Hayes Dep. 126–27, 136, 157, 174–75.) Hayes told Barker that he had "concerns" about McKinney's assisting him with blood spots, because her work was "sloppy." (Hayes Dep. 128, 280.) The plaintiff conceded that having McKinney do the blood spots would "technically" take one "minor task" off his plate. (Hayes Dep. 157–58.)

Asked whether he started teaching McKinney how to do blood spots properly, Hayes noted that he had "made the point" to Barker that he was not a trainer, that that was Barker's job. (Hayes Dep. 172.) He nonetheless claimed that he had "offered [his] assistance to McKinney" and that there were times when she "shadow[ed]" and "watch[ed]" him but otherwise did not want to "hear anything [he] had to say." (Hayes Dep. 172–73.)

## II.    PROCEDURAL HISTORY

Hayes filed suit against FMMS on December 8, 2020. In response to FMMS's motion for partial dismissal of his claims, he filed his Amended Complaint on January 29, 2021. (Doc. No. 12.) The Amended Complaint states claims for: (1) racial harassment in violation of Title VII; (2) race discrimination/disparate treatment in violation of Title VII; (3) retaliation in violation of Title VII; (4) disability discrimination (failure to accommodate) in violation of the ADA; (5)

failure to engage in the interactive process in violation of the ADA; and (6) retaliation in violation of the ADA.

FMMS has now filed its Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Facts, the three deposition transcripts referenced herein, and various other evidentiary materials, seeking judgment in its favor on each of the plaintiff's claims. (Doc. Nos. 38–41.) The plaintiff has filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Response to the Statement of Undisputed Facts, and his own evidentiary material (Doc. Nos. 45–47); the defendant filed a Reply (Doc. No. 49).

## III. STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—

that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV. DISCUSSION

### A. Title VII – Discrimination Claim

To establish a race discrimination claim in the absence of direct evidence of discrimination, a plaintiff may rely on circumstantial evidence. In the Sixth Circuit, as elsewhere, to prove a Title VII disparate treatment claim based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination. Typically, to establish a *prima facie* case of race discrimination, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the plaintiff makes such a showing, the burden shifts to the defendant to "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* A successful showing on the part of the defendant then shifts the burden back to the plaintiff to prove that the defendant's proffered reason was "merely a pretext for discrimination." *Id.* at 391–92.

When a plaintiff alleges *reverse* race discrimination, however, he bears the heightened burden of "demonstrating that he was intentionally discriminated against despite his majority status." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citation and internal quotation marks omitted)). The Sixth Circuit has modified the *McDonnell Douglas prima*

*facie* test to make it applicable when "a member of the majority is claiming discrimination on the basis of race." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). In that situation, the first prong of the *McDonnell Douglas* test is modified to require that the plaintiff demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (brackets omitted) (quoting *Murray*, 770 F.2d at 67). The fourth prong is similarly modified to require that the plaintiff show that he "was treated differently than similarly situated employees of a different race." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012).

In this case, FMMS argues that it is entitled to summary judgment on Hayes's disparate treatment claim, because (1) Hayes cannot establish "background circumstances" to support an inference that FMMS is an unusual employer that discriminates against the majority; (2) Hayes cannot identify a similarly situated comparator who was treated more favorably than he; (3) even assuming that Hayes can make out a *prima facie* case of reverse discrimination, he cannot show that FMMS's legitimate, non-discriminatory reason for the adverse action against Hayes is pretextual.

### 1.    The First Element – Background Circumstances

Courts have found litigants to have met the "background circumstances" requirement through a variety of means, including by presenting statistical evidence or employment policies showing a history of unlawful consideration of race by the employer, *Sutherland*, 344 F.3d at 615, evidence that the person responsible for the employment decision was a member of a racial minority, *Zambetti*, 314 F.3d at 257, or evidence of ongoing racial tension in the workplace, *Boger v. Wayne Cty.*, 950 F.2d 316, 324–25 (6th Cir. 1991).

FMMS argues that none of these circumstances is present here. It maintains that the plaintiff has not presented any statistical evidence, that it is undisputed that FMMS's workplace was not "predominantly comprised of minorities," and that, although Barker was "involved" in hiring the plaintiff, and Dr. Li, who is Asian, was involved in his termination, Bill Leftwich, who is White, was "central in *both* decisions." (Doc. No. 39, at 11.)

In response, the plaintiff argues, first, that the court should jettison the "background circumstances" requirement, as it is not supported by the language of the statute or Supreme Court precedent. (Doc. No. 45, at 11 (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80 (1976)).) He also points to Sixth Circuit opinions voicing "misgivings about the soundness of a test [that] imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts." (*Id.* at 12 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir. 1994)).) Be that as it may, as set forth above, the Sixth Circuit has repeatedly, and consistently, applied the "background circumstances" element of the *prima facie* case where a White employee alleges race discrimination, and this court is bound by that precedent.

The plaintiff, however, also argues that there is at least a material factual dispute as to who actually made the termination decision, given that Bill Leftwich appeared to conclude that the plaintiff should be terminated based entirely on the recommendation of Larry Barker, the plaintiff's African American direct supervisor. As the plaintiff argues, "if a supervisor performs an act motivated by [prohibited] animus that is intended by the supervisor to cause [the formal decisionmaker to take] an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (footnote omitted); s*ee also Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 350, 351 n.10 (6th Cir. 2012) (extending *Staub* to the Title VII context and explaining that, under this theory,

a plaintiff "must show that '[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw" (citation omitted) (alterations in original)).

Because the plaintiff has presented facts from which it may be inferred that Leftwich's decision was based entirely on information presented by Barker and on Barker's recommendation and that Leftwich conducted little, if any, investigation into Barker's claims regarding the plaintiff's alleged misconduct, the court finds that the plaintiff has shown the existence of a material factual dispute as to whether he can establish the requisite "background circumstances" to support a claim of reverse race discrimination.

### 2.    The Fourth Element – Disparate Impact

The defendant also argues that the plaintiff cannot establish the fourth element of his *prima facie* case, that he was treated differently from similarly situated employees of a different race. To make the requisite showing, Hayes "must show that he was similarly situated in all of the relevant respects to an employee of a different race who was treated better." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (internal quotation marks and citations omitted). Generally, to determine whether the alleged comparator is actually similarly situated, the court considers "whether the employees: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards[, a]lthough other factors may also be relevant, depending on the facts of each case." *Id.* (internal citations omitted).

Hayes does not dispute that these considerations are relevant, but he argues that, when there are no similarly situated comparators, a plaintiff may offer "other evidence that is sufficient to create an inference of discrimination to establish a *prima facie* case." (Doc. No. 45, at 14–15 (quoting *Faure v. The Ohio State Univ.*, No. 2:19-cv-1949, 2021 WL 5918914 (S.D. Ohio Dec. 14, 2020)).) The plaintiff is correct. The Sixth Circuit has recognized that, "so long as additional

evidence exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in light of common experience, the required inference of discrimination can be made in satisfaction of the prima facie case," "even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably." *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) (internal quotation marks omitted).

The plaintiff here claims that he effectively was a "class of one" with no similarly situated comparators, because he was the only employee working as a master forensic technician while also being responsible for managing the evidence locker. He claims that he personally reported several other forensic technicians who were African American for violating policies and procedures for collecting and maintaining evidence in homicide cases but they were never disciplined, while he was disciplined despite not having actually violated any existing policy that the defendant could identify. In addition, he points out that it is "undisputed" that Kirby McKinney, who is Black, replaced him in the managing the evidence locker after his termination. (*See* Barker Dep. 36.) In its Reply, the defendant argues only that the plaintiff offers McKinney as his comparator but cannot show that she engaged in the same conduct but was treated more favorably.

As noted above, however, a plaintiff may establish the fourth element of his *prima facie* case by showing either that he was replaced by a person of a different race or that he was treated differently than a similarly situated employee outside his race. The defendant does not actually contest the plaintiff's assertion that he was replaced by McKinney, a Black employee. Given that establishing a *prima facie* case test is not meant to be particularly rigorous, and in consideration of the Sixth Circuit's caution against imposing "a more onerous standard for [Title VII] plaintiffs

who are white or male," *Pierce*, 40 F.3d at 801 n.7, the court finds that the plaintiff has at least created a material factual dispute as to this element as well.

### 3. Pretext

FMMS has met its burden of articulating a legitimate, non-discriminatory reason for the plaintiff's suspension and termination: his work performance issues, as detailed in Barker's July 24, 2019 email, providing a list of thirty-two incidents in which the plaintiff had allegedly engaged in inappropriate conduct. (Doc. No. 41-1, at 150.) Included on this list are Barker's assertions that Hayes failed to apply barcodes to evidence, left the evidence room unorganized, and was insubordinate. (*Id.*) In a follow-up email dated August 9, 2019, Barker expressed continued frustration with the plaintiff's performance and attitude. (*Id.* at 155.) The defendant argues that the plaintiff cannot establish that its reasons are pretextual.

Because FMMS has satisfied its burden of articulating a non-discriminatory reason for Hayes's termination, the burden of production shifts back to Hayes to show that FMMS's proffered justification is pretextual for unlawful retaliation. *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 667 (6th Cir. 2020) (citation omitted). "All that a plaintiff must show in order to overcome a defendant's motion for summary judgment at this stage is that a reasonable juror could find that the defendant's reasons were pretextual. The plaintiff does not need to prove pretext; [he] only needs to show that the question of pretext is a genuine factual dispute." *Id.* Typically, to do so, the plaintiff must offer evidence from which it may be inferred that the employer's proffered reason "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 281 (6th Cir. 2018) (quoting *White*, 533 F.3d at 393).

The plaintiff argues, first, that he should not be required to show pretext, based on the plain language of Title VII and the Supreme Court's holding in *Bostock v. Clayton County*, 140 S. Ct.

1731 (2020). *Bostock*, however, simply reaffirmed that Title VII requires proof of "but for" causal connection, not sole causation, to establish liability for discrimination. *See id.* at 1739 ("[The ordinary meaning of 'because of' is 'by reason of' or 'on account of.' In the language of law, this means that Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation. That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause." (internal quotation marks and citations omitted)). And the Sixth Circuit, following *Bostock*, has continued to apply the *McDonnell Douglas* burden-shifting framework to Title VII discrimination claims. *See, e.g.*, *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508–09 (6th Cir. 2021) (reaffirming that Title VII plaintiff, at the third *McDonnell Douglas* stage, "has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination"); *Smith v. City of Toledo*, Ohio, 13 F.4th 508, 515 (6th Cir. 2021) (same); *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020) (same, describing the plaintiff's burden as requiring him to "present some evidence suggesting that [the defendant's] asserted reason is not the real reason [it] declined to renew his contract, or at least not the real reason he was let go as opposed to another term employee," and noting that the plaintiff's burden is not heavy and that "summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual"). The plaintiff's burden is simply to produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and citation omitted).

The defendant argues that the plaintiff cannot meet his burden, because (1) Leftwich, the primary decisionmaker, is White; (2) the "same actor inference" applies, because Leftwich and

Barker together hired Hayes in 2011 and again in 2015, both were responsible for promoting him, and both played a role in his termination; and (3) and the plaintiff has "no credible argument that . . . suggests FMMS terminated him because of his skin color." In response, the plaintiff argues that he can meet this burden, because there are factual disputes as to whether the proffered reasons for his discharge had any basis in fact or were sufficient to justify his termination and that the "same-actor inference" does not apply, in light of a material factual dispute as to who actually was responsible for the decision to terminate him.

The court is persuaded by the plaintiff's arguments, but just barely. In particular, regarding the same actor inference, while it appears to be undisputed that Barker and Leftwich together decided to hire the plaintiff and that Leftwich had final say in the decision to terminate him, it also seems fairly clear that Leftwich's decision was prompted entirely by Barker's desire to terminate Hayes and his provision of the list of incidents to support that decision. Accordingly, there is at least a material factual dispute as to whether the same-actor inference is warranted here.

Second, the plaintiff was promoted to master technician on April 3, 2019. Barker testified that, if a technician is not performing at the requisite level, he cannot be promoted to master technician. (Barker Dep. 20.) He also testified that for promotion to master technician, an individual must demonstrate that he can "perform additional duties" and can "go above and beyond the call of duty." (Barker Dep. 19.) In addition to basic proficiency, a master technician must demonstrate "accuracy, speed," and "[b]asic attitude, drive . . . , wanting to work, coming to work on time." (*Id.*) The plaintiff was promoted in early April 2019, giving rise to an inference that he satisfied those criteria. This is striking, because a large majority of the alleged incidents on Barker's list took place in 2018, before the plaintiff's promotion, with only a handful of them taking place between April 30, 2019 and July 24, 2019.

Third, although the plaintiff was written up in March 2018, he did not receive any other verbal or written discipline until his suspension and subsequent termination in August 2019, and many of the later incidents seem to be relatively minor. And finally, the plaintiff claims that he began reporting racial harassment on April 22, 2019, and it was shortly after that that Barker began noting dissatisfaction with the plaintiff's performance, ultimately leading to his termination.

The plaintiff's evidence of pretext, like the evidence to support his *prima facie* case of discrimination, is decidedly weak. The court, however, cannot find that *no* reasonable jury would believe the plaintiff's testimony that many of the incidents on Barker's list simply did not occur and others did not occur in the way Barker represented, that the defendant was looking for reasons to terminate Hayes, and that, even assuming many of the incidents did occur, that they were cumulatively insufficient to explain the employer's action. In light of that evidence, a reasonable jury could conclude that the defendant's reason is pretextual and, accordingly, that race was a factor in the plaintiff's termination. The court will deny summary judgment on this claim.

### B.      Title VII – Racial Harassment/Hostile Work Environment

To establish a *prima facie* case of a hostile work environment based on circumstantial evidence, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race, color, or sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known about the harassment and failed to act. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). The Sixth Circuit has indicated that a White plaintiff asserting a racial harassment claim must also demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Arendale v. City of Memphis*, 519 F.3d 587, 604–05 (6th Cir. 2008) (quoting *Sutherland*, 344 F.3d at 614).

The conduct in question must be objectively hostile or abusive, and the victim must subjectively perceive the environment to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). The alleged incidents of unwelcome harassment are to be considered together to determine whether, under the totality of circumstances, they constitute a hostile work environment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).

"In determining whether an actionable hostile work environment claim exists, [courts] look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (internal quotation marks and citations omitted).

### 1. The Plaintiff's Prima Facie Case

The defendant argues that the plaintiff's racial harassment claim fails at the first step, because he cannot demonstrate "background circumstances" to support a claim of "reverse" racial harassment. The court has already found that there is a material factual dispute as to the existence of such background circumstances.

The defendant argues next that the plaintiff cannot show that any harassment he suffered was "based on race." The defendant argues that the plaintiff cannot show that his co-workers' conduct in labeling him a racist, asking if he lynched anyone over the weekend, and posting a photoshopped photograph of him dressed as a member of the Ku Klux Klan was "based on race," because the plaintiff admits that the co-workers' conduct was "not motivated by Plaintiff's race but rather by his coworkers' desire to get him back for reporting 'their sloppy work or their errors

and judgments in evidence or mistakes.'" (Doc. No. 39, at 14 (quoting Hayes Dep. 212).) The defendant's argument defies logic. The plaintiff's co-workers may have disliked him for many reasons, but their subjective motivations do not override the overt racial basis of their alleged comments. Likewise, if a man harasses a woman by engaging in catcalling, inappropriate sexual innuendo, and blatantly sexist remarks, the harassment would still be deemed to be "based on sex," regardless of whether the conduct is motivated by "sex-discriminatory animus," *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009), or simply by the man's dislike of the woman for other reasons. The plaintiff clearly alleges harassment "based on race." *See id.* at 272 ("The district court, in evaluating the 'based on sex' element, focused too narrowly on the motivation for the harassers' offensive conduct rather than on the effects of the conduct on the victim-recipient.").

The defendant also argues that the alleged harassment was not sufficiently severe or pervasive to give rise to a racially hostile work environment. This argument gains more traction. The allegedly harassing conduct began in April 2019 and consisted of a few verbally offensive comments and the posting and distribution of one photoshopped image of the plaintiff in the garb of a Ku Klux Klansman. The plaintiff estimated that the offensive comments—labeling him as a racist, asking if he had lynched anyone—were made "[p]robably more than five" times but not more than ten. (Hayes Dep. 210.) The photograph was posted "three, maybe four times." (Hayes Dep. 256.) Hayes claims that it was distributed on social media, by which he means that it was posted on Facebook "Messenger" to a group that consisted only of FMMS forensic technicians. (Hayes Dep. 257–58.) Hayes claims that, because he was labeled as a racist, his colleagues distanced themselves from him and did not want to work with him. However, he does not allege that his co-workers engaged in physically threatening or humiliating conduct or that the comments

unreasonably interfered with his job performance. *Morgan*, 536 U.S. at 116. He does not indicate that it took place over a prolonged period of time.

While the plaintiff might have subjectively found the conduct to be offensive and harassing, no reasonable jury would find the alleged harassment to be objectively sufficiently severe and pervasive to "amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 778. The defendant is entitled to summary judgment on this claim.

### C.      Title VII – Retaliation

A Title VII retaliation claim based on circumstantial evidence is also evaluated at the summary judgment stage using the *McDonnell Douglas* framework. Under this framework, to make out a *prima facie* case of retaliation, "a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 283 (6th Cir. 2018) (citing Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)). If the plaintiff makes this showing, then "the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). If the employer does so, then "'the burden shifts back' to Plaintiff to demonstrate that Defendants' proffered reason was not the true reason for the employment decision." *Id.* (quoting *Dixon*, 481 F.3d at 333).

In support of its argument for summary judgment on the plaintiff's Title VII retaliation claim, the defendant argues only that Leftwich, the ultimate decisionmaker, was unaware that the

plaintiff had told Barker that he was going to file an EEOC charge and, therefore, that the plaintiff cannot establish that the defendant knew that he had engaged in protected conduct.

The defendant is not entitled to summary judgment on this basis. As set forth above, there is a material factual dispute as to who actually made the termination decision and, in particular, as to whether Leftwich acted as Barker's agent in approving the plaintiff's termination. And the plaintiff clearly alleges both that he told Barker that he was going to make a report to the EEOC and that he told both Barker and Leftwich about the alleged racial harassment by his colleagues, but neither took any action. (Hayes Dep. 205.) Complaints about racial harassment constitute protected conduct, so long as they are "based on a reasonable and good faith belief that the opposed practices were unlawful." *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (internal quotation marks and citation omitted); *see id.* ("To come within the protection of Title VII, [a plaintiff] must establish that he challenged an employment practice that he reasonably believed was unlawful.").

The defendant has not shown that it is entitled to summary judgment on the plaintiff's Title VII retaliation claim.

### D. ADA – Disability Discrimination

It is undisputed, at least for purposes of the Motion for Summary Judgment, that the plaintiff has diabetes, and he claims that he was either actually disabled by this impairment or perceived as disabled by FMMS. He alleges that he suffered discrimination because of his disability. (Doc. No. 12 ¶¶ 75–85.)

Insofar as the plaintiff's ADA discrimination claim is premised on circumstantial evidence, it is also subject to the *McDonnell Douglas* framework. In support of its Motion for Summary Judgment as to this claim, the defendant argues only that, even assuming the plaintiff can establish a *prima facie* case of disability-based discrimination, the plaintiff cannot show that the defendant's

legitimate, non-discriminatory reason for the adverse employment action is pretextual, for the same reasons as those set forth in addressing the plaintiff's Title VII discrimination claim. (Doc. No. 39, at 20.) The defendant makes no effort to tailor its argument to the ADA context. Accordingly, because the court has found that material factual disputes preclude summary judgment on the question of pretext in the Title VII context, the court also finds that the defendant has not established that it is entitled to summary judgment on the plaintiff's ADA discrimination claim.[6]

### E.     ADA – Failure to Accommodate and Failure to Engage in the Interactive Process

The Sixth Circuit has explained that "ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016)). "Direct evidence of disability discrimination 'does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor.'" *Id.* (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018)). Thus, when the employer admits that it relied to some extent upon the plaintiff's disability in making an employment decision, *McDonnell Douglas* does not apply, "because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant and the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Id.* (quoting *Ferrari*, 826 F.3d at 892).

The Sixth Circuit has also stated that, because "failure to accommodate is listed in the Act's definition of disability discrimination, 'claims premised upon an employer's failure to offer a

---

[6] Leftwich and Barker both deny knowing that the plaintiff had diabetes. (Leftwich Dep. 111–12; Barker Dep. 51.)

reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. . . . [I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination.'" *Id.* (citing 42 U.S.C. § 12112(b)(5)(A) and quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007)).

Thus, insofar as the plaintiff's claim of disability discrimination is based on the defendant's failure to offer a reasonable accommodation and failure to engage in the interactive process, he relies upon direct evidence. Under the direct-evidence framework, Hayes must prove (1) that he is disabled under the ADA, and (2) that he is "otherwise qualified" for the position despite his disability, either (a) without accommodation from the employer, (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation. *Id.*; *see also Kleiber*, 485 F.3d at 869. In this situation, the defendant bears the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" it. *Id.* (quoting *Kleiber*, 485 F.3d at 869).

FMMS argues in this case that it is entitled to summary judgment on the plaintiff's failure to accommodate claim, because it offered a reasonable accommodation, which the plaintiff rejected.[7] As the defendant characterizes it, the plaintiff's request for an accommodation was that Barker fill in for him so that he could take breaks. (*See* Hayes Dep. 262–63.) The plaintiff

---

[7] There is a material factual dispute as to whether the plaintiff made it known to FMMS that he was making a request that it accommodate a disability. Barker testified that the plaintiff made vague references to his blood sugar on occasion but did not tell him he had diabetes, and Barker did not know what he meant. (Barker Dep. 51.) Barker also stated that he did not recall the plaintiff telling him that he "needed to take breaks periodically because of his blood sugar levels." (Barker Dep. 52.) The plaintiff claims, to the contrary, that he told Barker and that Barker told others that the plaintiff had diabetes. (Hayes Dep. 216.) Hayes also claims that Barker knew that he was on medication for diabetes and needed breaks related to his condition. (Hayes Dep. 215, 223–24.)

explained that other forensic technicians were able to take breaks throughout the day, but the plaintiff was not, because he was doing "work in evidence" while also performing autopsies, and his cases "in general . . . may have been more complicated." (Hayes Dep. 262–63.) He claimed that he "couldn't just stop and say I'm taking a break when I have two doctors waiting on me . . . or somebody waiting [in the lobby] to pick up evidence." (Hayes Dep. 230.) He admits that, at times, he was able to take breaks as necessary, without having to ask for them. (Hayes Dep. 225.)

FMMS argues that, in response to Hayes's request for more breaks, FMMS did provide the plaintiff with a "reasonable accommodation": after Hayes told Barker he was overwhelmed with his evidence duties, in order to alleviate Hayes's workload and allow him more time for breaks, Barker assigned Kirby McKinney to assist the plaintiff by taking on responsibility for "blood spots," or DNA testing. According to FMMS, Hayes, rather than accepting McKinney's help, refused to train her on performing blood spots and unilaterally decided that McKinney was unfit to help him. (Doc. No. 39, at 21.) The defendant argues that Hayes admitted that having McKinney help with blood spots would have lessened his workload. It also contends that, even though Hayes refused to train her, McKinney did eventually begin doing blood spots. (*See* Hayes Dep. 182–83.)

The defendant contends that the fact that the accommodation was not the one the plaintiff requested is not sufficient to allow him to defeat summary judgment, because an "employee is not entitled to demand the accommodation [he] prefers." (Doc. No. 39, at 22 (citations omitted).) Finally, the defendant contends that the plaintiff's claim that FMMS failed to engage in the interactive process must be dismissed, because a failure to engage in the interactive process does not give rise to an independent claim unless the plaintiff is first able to establish a *prima facie* case for failure to accommodate.

The court finds that a material factual dispute exists on this claim as well. The plaintiff presents evidence that the accommodation he needed was the ability to take breaks to be able to eat something to control his blood sugar or to deal with side effects from his medication, and having McKinney assist with blood spots did not accommodate that need. He also alleges that Barker allowed other technicians to take breaks while singling out the plaintiff, not allowing him to take necessary breaks, and that Barker made jokes about Hayes's diabetes and the side effects caused by his medication. (Hayes Dep. 143–44, 147, 150–51, 153, 215, 222–23, 224–25, 225–26, 229–30.)

The only element of the plaintiff's *prima facie* case that the defendant disputes is whether Hayes received a reasonable accommodation. Because Hayes has established a material fact in dispute on that issue, the defendant is not entitled to summary judgment on the question of whether the defendant failed to accommodate the plaintiff's disability. Further, because the only argument the defendant offers in support of its claim that it is entitled to summary judgment on the plaintiff's claim that it failed to engage in the interactive process is that the plaintiff cannot establish a *prima facie* case of failure to accommodate, the defendant is not entitled to summary judgment on the interactive-process claim either.

## F.      ADA – Retaliation

To establish a *prima facie* case for retaliation under the ADA, the plaintiff must demonstrate that (1) he engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021) (citations omitted). The *McDonnell Douglas* framework applies here, too. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046

(6th Cir. 2014). FMMS argues that Hayes cannot establish the fourth element of his *prima facie* case—a causal connection—and that he cannot show that the FMMS's legitimate, non-retaliatory reasons for Hayes's termination are pretextual. Hayes argues that he can establish both.

Regarding causation, Hayes points to his deposition testimony where he stated that Barker "told everyone I had diabetes, and they were laughing, I made the comment then that that's illegal and I was going to file a[n] EOC [sic] complaint." (Hayes Dep. 247–48.) Hayes explained that he meant that Barker's telling other employees that Hayes had diabetes and joking about it was illegal, and that he should "file an EOC complaint because [he] was tired of being harassed and treated unfairly." (*Id.* at 248.) He recalled that this occurred "[s]hortly before [he] was suspended and then terminated. . . . [P]robably around the end of July or mid July." (*Id.* at 249.) He was suspended without pay on August 7 and formally terminated on August 16, 2019. The defendant does not contend that the plaintiff did not engage in protected conduct.

In the Sixth Circuit, when "an adverse employment action occurs *very close in time* after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (emphasis added). The Sixth Circuit has held that a lapse of as much as two to three months may be sufficient to satisfy the causal connection prong of a retaliation claim. *See, e.g.*, *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) ("[T]his Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." (quoting *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007)); *Seeger v. Cincinnati Bell Tel Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (finding that "the nearness in time between [the plaintiff's protected activity] and his termination—three

weeks after his reinstatement and less than two months after he first notified [the defendant] of his medical leave—suffices in these circumstances to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge"); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (a period of less than three months held to be sufficient to establish a causal connection based on temporal proximity because a plaintiff's "burden in establishing a *prima facie* case is not intended to be an onerous one" (citation omitted)).

In this case, the plaintiff alleges that he engaged in protected activity and then was suspended without pay and then terminated within less than a month. The acute temporal proximity at issue here is sufficient, standing alone, to give rise to an inference of causation. The defendant, therefore, is not entitled to summary judgment based on this element. Moreover, as already discussed, there is a material factual dispute as to whether its proffered reasons for terminating the plaintiff are pretextual. The defendant has not shown that it is entitled to summary judgment on this claim either.

## V. CONCLUSION

For the reasons set forth herein, the court will grant summary judgment to the defendant on the plaintiff's claim of racial harassment/hostile work environment. The Motion for Summary Judgment will be denied with respect to the plaintiff's other claims, based on the existence of material factual disputes.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge